**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Robert F. Roehlen,

Plaintiff,

Civ. No. 10-3777 (RHK/FLN)
**MEMORANDUM OPINION AND ORDER**

v.

Ramsey County and Robert Fletcher, Ramsey County Sheriff, in his official capacity,

Defendants.

---

Alf E. Sivertson, Law Offices of Sivertson & Barrette, PA, St. Paul, Minnesota, for Plaintiff.

Thomas E. Ring, Ramsey County Attorney's Office, St. Paul, Minnesota, for Defendants.

---

## INTRODUCTION

Plaintiff Robert Roehlen worked as a deputy sheriff for the Ramsey County Sheriff's Department ("the department") for more than twenty years. He retired in July 2010 and then commenced this action against Defendants Ramsey County and Sheriff Robert Fletcher,[1] asserting that he was "forced out" of his job. Roehlen claims the County illegally retaliated against him in violation of both the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Minnesota Whistleblower Act, Minn.

---

[1] Although Roehlen has sued both Ramsey County and Sheriff Fletcher, the claims against Fletcher are only in his official capacity. Thus, the Court refers to Defendants collectively as "the County" or "the department" throughout.

Stat. § 181.932, subd. 1. The County has moved for summary judgment. For the reasons set forth below, the Court will grant its Motion.

## BACKGROUND

### I. Roehlen's employment

Roehlen was hired as a deputy sheriff in 1987. He worked in various units throughout his law-enforcement career with Ramsey County, including the transport unit, where he worked from 2003 until his retirement from Ramsey County. Transport deputies are responsible for transporting prisoners and civilly committed individuals to, from, or between jails, prisons, hospitals, and courts. Prisoners are transported in restraints (handcuffs), while committed civilians are unrestrained. Transport deputies typically work in pairs, although not always. They work predictable, weekday hours, and Roehlen chose to remain in the unit because he preferred this schedule. At all relevant times, Roehlen's supervisor in the transport unit was Sergeant Benet Witzmann, and Commander Ken Splittstoesser oversaw the unit.

The job description for a deputy sheriff in Ramsey County lists several required skills and abilities, including a number of physical abilities. It specifically requires a deputy to have the "[p]hysical strength and stamina to chase, apprehend, and detain suspects and prisoners." (Ring. Aff. Ex. 2, at 3.) In other words, a deputy must be capable of making a "forceful arrest," regardless of the unit to which he is assigned; Roehlen agrees that this is a "threshold" requirement for the job. (Roehlen Dep. 175.)

Prior to 2010, Roehlen's record was unblemished. He had never been disciplined for performance problems nor had he been the subject of any Internal Affairs ("IA")

investigation. At age 50, he was near the top of the seniority ranking for deputies in 2010. According to Roehlen, he enjoyed his job and found it satisfying.

**II. February 12, 2010 incident and Roehlen's OSHA complaint**

On February 4, 2010, Roehlen learned that a fellow deputy in the transport unit, A.S., had tested positive on a Mantoux test, a procedure used to screen for tuberculosis. Roehlen began researching the Occupational Safety & Health Act ("OSHA") and its respiratory-protection requirements. On February 8, he worked with A.S., and he observed that A.S. was coughing and had watery eyes. He also learned that A.S. had seen a doctor but did not believe his doctor and was worried that it "might have been . . . the tuberculosis coming out." (Roehlen Dep. 81.) After this, Roehlen decided he did not want to work with A.S. again because he was concerned about contracting A.S.'s illness. Four days later, however, Sgt. Witzmann assigned Roehlen to work with A.S. again.

Based on his OSHA research, Roehlen believed he had the right to refuse to work in a situation that would present a health risk. Accordingly, he refused to work with A.S. and asked to be assigned another partner. Roehlen did not specifically tell Witzmann his concerns about tuberculosis, nor did he expressly invoke OSHA during this conversation; he simply explained that he did not want to work with A.S. because he (A.S.) was sick. At the time, Witzmann knew A.S. had been medically cleared for tuberculosis and approved to work, but he did not inform Roehlen this was the case. (Witzmann Dep. 45-46.) Witzmann did not assign Roehlen another partner or allow him to work alone when he refused to work with A.S. Instead, Witzmann ordered Roehlen to go home.

Instead of going home, Roehlen took one of the department's transport vans and drove it to Regions Hospital. He believed Witzmann had acted improperly, and he wanted to contact Commander Splittstoesser, the person above Witzmann in the chain of command, to discuss the incident. Roehlen intended to wait at the hospital while he attempted to call Splittstoesser, and he remained there for three and a half hours until Witzmann learned of his whereabouts and ordered him to return to the law-enforcement center. Roehlen remained on the clock during this time, although he testified that he ultimately did not get paid for those hours. When he returned to the law-enforcement center, Roehlen gave Witzmann the van keys and was instructed to report to Undersheriff George Altendorfer. While Roehlen believed that taking the transport van and driving to the hospital was a "prudent course of action" at the time, he acknowledges that he disobeyed Witzmann's orders. (Roehlen Dep. 88-89.)

As a result of this incident, Roehlen met with Splittstoesser and Altendorfer on February 16. He knew he was facing potential discipline and wanted to explain that he had refused to work with A.S. pursuant to OSHA regulations and had not intended to be insubordinate. Roehlen gave Splittstoesser and Altendorfer a copy of the OSHA regulations on which he was relying. He also told them he intended to file an OSHA complaint. Altendorfer informed Roehlen there would be an internal affairs ("IA") investigation into his insubordination and offered to transfer Roehlen to a different unit away from Witzmann during the pending investigation. Roehlen believed the February 12 incident had only been "minor," however, and he enjoyed working in transports and

did not think separation from Witzmann was necessary, so he declined a transfer. (Roehlen Dep. 98.)

The IA complaint Witzmann filed listed the incident type as "insubordination," and the specific allegation was that Roehlen had "disobey[ed] an order." (See Roehlen Dep. Ex. 5.) Witzmann also mentioned two other recent incidents in the complaint, one in which Roehlen allegedly failed to call and check in and the other in which he did not take the van he was instructed to take. (See Roehlen Dep. 76-79.) Roehlen had not been disciplined or reprimanded regarding either of these previous incidents. Ultimately, the IA investigation concluded, and Roehlen was not disciplined in any way for disobeying Witzmann on February 12. (See id. 107.)

Roehlen filed an OSHA complaint regarding the department on February 17. His complaint described the way deputies were required to transport and guard prisoners who were suspected or confirmed to be infected with tuberculosis, the lack of training with respirators, and the general lack of any standards of protection within the department. (See Roehlen Dep. Ex. 4.) An investigation was conducted, and ultimately three citations resulted from Roehlen's complaint. Two involved fines, totaling $7,500, and the other was a "training-type" citation. (Id. at 141.)

**III. FMLA leave**

Meanwhile, in the winter and early spring of 2010, Roehlen began experiencing back pain. He had a condition called spondylolisthesis for which he underwent surgery

in June 2007.[2] Following his surgery, Roehlen was able to return to work with restrictions providing that he should not lift, carry, push, or pull more than 50 pounds, he should avoid "physically demanding training," and he should "[p]lease limit transport to restrained defenders only." (Sivertson Aff. Ex. 4, Report of Work Ability dated 9/18/2007.) Despite his back condition, Roehlen worked in the transport unit from the time he returned after his surgery to March 2010. He believed heightened stress at work due to the IA complaint may have contributed to the flare-up in 2010.

On March 13, 2010, Roehlen asked his doctor about the possibility of taking FMLA leave in order to spend time strengthening his back. His physician, Dr. Caccamo, certified FMLA leave for "active strengthening rehab," and he referred Roehlen to Physicians Neck & Back Clinic ("PNBC"). (Roehlen Dep. Ex. 8, at 2, 4.) Caccamo recommended a six-week leave, beginning as soon as Roehlen could begin his rehabilitation at PNBC. (Id. at 3.) The FMLA paperwork was completed on March 19, at which time Ramsey County placed Roehlen on leave.

Roehlen went to PNBC twice and was deemed a good "candidate" for the clinic's intensive rehab program. (Ring Aff. Ex. 7, at 2.) He was concerned, however, that his back muscles were "not strong enough to handle the intensity" of the PNBC program and that it was "too much too quick" (Roehlen Dep. 135-36), and did not continue with the rehab program after his first two visits. Instead, he did an "at-home regimen" of

[2] Spondylolisthesis is a condition in which vertebrae in the lower part of the spine slip out of the proper position. It can range from mild to severe; some individuals with the condition have no symptoms, while others experience lower back pain, stiffness, tenderness, or muscle tightness. See http://www.nlm.nih.gov/medlineplus/ency/article/001260.htm (last visited Oct. 3, 2011).

exercises that PNBC had given him. (Id. 137.) He remained on leave for eight or nine weeks, spending approximately two hours each day doing his back exercises or other activities, such as walking or bicycling.

**IV. Return from leave and subsequent retirement**

Roehlen returned to work from his FMLA leave on May 12, 2010. He presented Witzmann with a letter from Dr. Caccamo, which provided:

> [Roehlen] has been on FMLA leave since 3/15/10 due to his chronic back problems. He may return to work now. He should have the following restrictions indefinitely:
>
> - Because of fluctuations in his back pain symptoms, he should be allowed to exercise discretion about whether he is able to go on any given long transport road trip. Please allow him to decline any particular trip if his back is bothering him significantly at that time.
>
> - He should only transport restrained prisoners.

(Roehlen Dep. Ex. 10.) Witzmann initially sent Roehlen on an assignment to transport a prisoner from the workhouse but, after further reviewing the letter, Witzmann became concerned and consulted with Altendorfer. Witzmann felt that the restrictions were ambiguous and indefinite, and he was unsure whether Roehlen could continue to work in the transport unit given his restrictions. (See Splittstoesser Dep. Ex. 28.) Altendorfer instructed Witzmann to send Roehlen home, so Witzmann called Roehlen back to the law-enforcement center.

Witzmann spoke to Roehlen in the garage at the law-enforcement center, informing him that the department could not accommodate his restrictions and could not use him at that time, and sent him home. (See Roehlen Dep. 141; Witzmann Dep. 70-

71.) The next morning, Roehlen called to ask whether he should report to work. Witzmann confirmed that the department "[could] not accommodate those restrictions," saying, "for right now there is no, um, no position for you being with those restrictions." (Roehlen Dep. Ex. 11 (transcript of 5/13/10 phone conversation).) He suggested that Roehlen contact Deb Boldt in Human Resources or talk to Altendorfer or Splitsttoesser about his status. When Boldt spoke to Roehlen that same week, she "explained to him that [the department] could not accommodate his restrictions," and that once his remaining weeks of FMLA leave were exhausted he would have to pursue another option, such as a medical leave of absence. (See Splittstoesser Dep. Ex. 30.) She also informed Roehlen and Splittstoesser that Roehlen's twelve weeks of FMLA leave would expire on June 7, 2010. (See id.)

Roehlen sent a memorandum to Splittstoesser on May 18, explaining that he had attempted to return to work on May 12 but was sent home after only two and a half hours, and he had since been forced to take additional time off. (See Sivertson Aff. Ex. 9.) He went on to state, "I am ready to come back to work. Please advise me when I can return to work." (Id.) A week later, Roehlen spoke to Splittstoesser on the phone. Splittstoesser explained that things could change if Roehlen's doctor felt comfortable lifting some of his restrictions, but he said, "if those restrictions don't change, if you aren't able to do anything more than this slip says . . . the department is really saying that they don't even think you can work as a deputy sheriff." (Roehlen Dep. Ex. 12, at 4.) He reiterated that a deputy sheriff must be able to make a "forceful arrest," and if Roehlen remained so restricted that he could not do so, then there might not be any job for him in

the department when his FMLA leave time ran out. (Id. at 3-4.) Splittstoesser also suggested a number of options Roehlen might consider, including a medical leave of absence, short-term or long-term disability, or submitting a resume to Human Resources so they could try to find him another position within the county. (Id. 1-2.) Roehlen understood that he was back on FMLA leave for the immediate future, and he felt "the decision had been made" that he could not return to his job as a deputy sheriff. (Roehlen Dep. 176-77.)

In the following weeks, Roehlen did not speak to anyone further up the chain of command as Splittstoesser had encouraged him to do. (Id. at 189.) He did not look into disability benefits or consider taking an extended medical leave because he could not afford to pay for benefits and health insurance for himself and his family if he went on an unpaid leave. (Id. at 194-96.) Neither Roehlen nor the department attempted to obtain another medical opinion about the restrictions set forth in his return-to-work letter. (Id. at 193-94.) Roehlen failed to return a number of phone calls from Boldt and Splittstoesser. (See Janet Roehlen Dep. Ex. 49.)

Roehlen applied for his pension benefits in early July. On July 6, 2010, he wrote another memorandum to Splittstoesser with the subject "resignation letter." It provided:

> Although it was my intention to return to full-time deputy after my FMLA leave, it has been made clear to me that there are no positions you will allow me to work.
>
> Due to my limited amount of benefit time remaining, I have no choice but to resign my position as deputy sheriff effective on Friday, July 23, 2010.

(Sivertson Aff. Ex. 10.) According to Roehlen, he had planned to continue working for another ten years until age 60, when the youngest of his six children would be 18 years old. He claims he has not enjoyed retirement and "would rather be working." (Roehlen Dep. 188.) In February 2011 he began a new job driving a van for a company that transports elderly and physically disabled individuals, and he passed the physical examination and met all of the position's requirements. (Id. at 20-21.)

Roehlen commenced the instant action on August 30, 2010, alleging that Ramsey County retaliated against him for (1) going on FMLA leave, in violation of the FMLA, and (2) exercising his rights and reporting violations pursuant to OSHA, in violation of the Minnesota Whistleblower Act. The County has moved for summary judgment. The Motion has been fully briefed, the Court heard oral arguments on September 27, 2011, and the matter is ripe for decision.

**STANDARD OF DECISION**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

## ANALYSIS

### I. Whistleblower retaliation claim

Roehlen asserts that he engaged in protected conduct under the Minnesota Whistleblower Act by (1) refusing to partner with A.S. because A.S. was sick, which he believed was his right under OSHA regulations, and (2) filing an OSHA complaint against the department. The portions of the Act upon which he relies provide:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> > (1) the employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official
> >
> > * * *
> >
> > (3) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason.

Minn. Stat. § 181.932, subd. 1(1), (3).

Claims under the Minnesota Whistleblower Act are analyzed using the familiar McDonnell Douglas burden-shifting framework. E.g., Pope v. ESA Servs., Inc., 406 F.3d

1001, 1010 (8th Cir. 2005); Cokley v. City of Ostego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001). Accordingly, Roehlen has the initial burden of establishing a *prima facie* case of retaliation. The elements of a *prima facie* case under the Minnesota Whistleblower Act are: "(1) statutorily protected conduct by the employee; (2) an adverse employment action by the employer; and (3) a causal connection between the two." Cokley, 623 N.W.2d at 630 (quoting Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 444 (Minn. 1983)). If Roehlen can establish a *prima facie* case, the burden shifts to Ramsey County to articulate a legitimate, non-retaliatory reason for the adverse action, after which the burden shifts back to Roehlen to show that the proffered reason was a pretext for retaliation. E.g., Skare v. Extendicare Health Servs., Inc., 431 F. Supp. 2d 969, 974 (D. Minn. 2006) (Kyle, J.), aff'd 515 F.3d 836 (8th Cir. 2008) (applying burden-shifting framework to whistleblower claim). Ultimately, "[Roehlen] has the burden to prove by a preponderance of the evidence that [Ramsey County's] action was for an impermissible reason." Id. (citing Cokley, 623 N.W.2d at 630)).

Roehlen identifies a number of allegedly retaliatory actions on the part of the County. The County argues, however, that his whistleblower claim fails as a matter of law for three reasons: (1) he was not a whistleblower; (2) he cannot establish a *prima facie* case of retaliation; and (3) he cannot show that Defendants' proffered explanations for any adverse employment actions were pretext for retaliation. Because the Court agrees that Roehlen cannot show pretext and his claim thus fails as a matter of law, it need not address the first two arguments and instead moves directly to the final step of McDonnell Douglas. See, e.g., Riser v. Target Corp., 458 F.3d 817, 820-21 (8th Cir.

2006) (citing U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)) (noting that where employer has proffered legitimate, non-discriminatory reason for its action as required at step two of McDonnell Douglas, it becomes irrelevant whether the plaintiff has established a *prima facie* case, and the court may move directly to the question of pretext). At the final step, a plaintiff may demonstrate a material question of fact regarding pretext either by showing that "the employer's explanation is 'unworthy of credence . . . because it has no basis in fact'" or by "'persuading the court that a [prohibited] reason more likely motivated the employer.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc). The Court will address each of the purportedly retaliatory actions in turn.

First, Roehlen points to Witzmann's order that he go home on February 12 after he refused to work with A.S. He claims this was retaliation against him for exercising his right to refuse to work in a potentially hazardous situation.[3] He had not yet reported or threatened to report any OSHA violations at the time of this order, so his claim is based solely on the provision of the Whistleblower Act that protects an employee who "refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, *and the employee informs the employer that the order is being refused for that reason*."

[3] The Court has some doubt whether this is a sufficient "adverse employment action" for a retaliation claim. Typically, an adverse action for purposes of a retaliation claim is an action that "well might have dissuaded a reasonable worker" from engaging in the protected conduct. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (citations omitted); accord Lisdahl v. Mayo Found., 633 F.3d 712, 720 (8th Cir. 2011). However, even assuming without deciding that this was an adverse action, the claim fails.

Minn. Stat. § 181.932, subd. 1(3) (emphasis added). However, it is undisputed Roehlen did not inform Witzmann he was refusing the order based on a right to refuse to work pursuant to OSHA, nor is there any evidence he even mentioned OSHA. According to both Roehlen and Witzmann, Roehlen simply said he refused to work with A.S. because he was "sick."

Moreover, there is no evidence that Witzmann's reasons lacked credence or that his true motive was retaliatory. According to Witzmann, he was short on staff that day and he needed two deputies for the assignment, so he could not allow Roehlen to take the assignment alone, nor did he have anyone else available to partner with Roehlen. Thus, when Roehlen refused to work with A.S., Witzmann ordered him to go home. Roehlen argues that Witzmann could have (and should have) partnered him with someone else or allowed him to work alone, but he offers no evidence to dispute Witzmann's testimony about the staffing requirements at the time. It is not the Court's role to act as a "super-personnel department[] reviewing the wisdom or fairness" of Witzmann's decision to send Roehlen home unless it involved intentional discrimination or retaliation. Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995). In the Court's view, Roehlen has not presented evidence from which a reasonable jury could conclude that Witzmann's order involved intentional retaliation.

Next, Roehlen asserts that the IA complaint against him was in retaliation for his lodging an OSHA complaint. See Minn. Stat. § 181.932, subd. 1(1). The department's proffered reason for the IA complaint was Roehlen's insubordination, namely, his disobedience of an order. (See Roehlen Dep. Ex. 5.) That Roehlen disobeyed orders is

amply supported by the record. In fact, he acknowledges that he "disobeyed both orders" Witzmann gave him on the morning of February 12—to work with A.S., and to go home—and he acknowledges that he "probably should have [gone] home" instead of driving the transport van to Regions Hospital. (Id. 88-89.) Nothing in the record suggests that the IA complaint was motivated by Roehlen's OSHA complaint. The only link between the IA complaint and the OSHA complaint is timing: Roehlen filed his OSHA complaint on February 17 (Roehlen Dep. Ex. 4), and Witzmann filed the IA complaint on February 18 (id. Ex. 5). Yet the Eighth Circuit has consistently ruled that "more than a temporal connection is required to present a genuine issue on retaliation." Arraleh v. Cnty. of Ramsey, 461 F.3d 967, 979 (8th Cir. 2006); accord, e.g., Hervey v. Cnty. of Koochiching, 527 F.3d 711, 723-24 (8th Cir. 2008). Furthermore, "[a] plaintiff must show that the employer had actual or constructive knowledge of the protected activity" in order to show retaliation. E.g., Buettner v. Arch Coal Sales Co., 216 F.3d 707, 715 (8th Cir. 2000). Roehlen never told Witzmann about his OSHA complaint, and, even if Witzmann was aware of the OSHA complaint on February 18, it is undisputed that he did not know who had filed it. (See Roehlen Dep. 102; Witzmann Dep. 60-61.) Accordingly, the IA complaint could not have been an act of retaliation.

Finally, Roehlen argues the department's failure to return him to his position following FMLA leave, which ultimately led him to retire, was an act of retaliation for his OSHA complaint.[4] Yet he had no knowledge of how any of his superiors reacted to

[4] The County argued at length, both in its memoranda and at the September 27th hearing, that no constructive discharge occurred here and thus there was no adverse employment action.

the OSHA complaint (see Roehlen Dep. 102-03) and offers no evidence linking the department's refusal to reinstate him to his OSHA complaint. Additionally, as more fully explained below in relation to the FMLA claim, the record supports the department's proffered, non-retaliatory reasons for not returning Roehlen to his position—it could not accommodate his new medical restrictions and he was unable to perform duties of the job—and Roehlen has not created a genuine issue whether these reasons were pretextual.

Finally, Roehlen claims that the "acts of retaliation" should be viewed "in their totality" to support his whistleblower claim. (Mem. in Opp'n at 20.) The Eighth Circuit has held "it is proper to consider the cumulative effect of an employer's alleged retaliatory conduct." Fercello v. Cnty. of Ramsey, 612 F.3d 1069, 1083-84 (8th Cir. 2010). Yet even viewing the allegedly retaliatory acts set forth above in their totality, the Court determines that the evidence here fails to establish a genuine issue on the question of pretext. In the Court's view, the whistleblower claim thus fails as a matter of law.

## II. FMLA retaliation claim

The FMLA permits an employee to take up to twelve weeks of leave during a twelve-month period for a "serious health condition that makes the employee unable to perform the functions of [his] position." 29 U.S.C. § 2612(a)(1)(D). It also prohibits an employer from discriminating against an employee who exercises his rights under the Act. Id. § 2615(a)(2). "Basing an adverse employment action on an employee's use of leave, or in other words, retaliation for exercise of [FMLA] rights, is therefore

---

However, because the Court determines Roehlen has failed to present a genuine issue on the question of pretext, it need not (and does not) analyze the elements of the *prima facie* case, including the question of whether Roehlen was constructively discharged.

actionable." Smith v. Allen Health Sys, Inc., 302 F.3d 827, 832 (8th Cir. 2002). Like a claim for whistleblower retaliation, an FMLA retaliation claim is analyzed using the McDonnell Douglas framework. Id. A *prima facie* case once again requires Roehlen to show that (1) he exercised his rights under the FMLA, (2) he suffered an adverse employment action, and (3) there was a causal connection between his exercise of rights and the adverse action. Id. (citing Darby v. Bratch, 287 F.3d 673, 679 (8th Cir. 2002)).

The parties largely conflate their arguments on the FMLA claim with those on the whistleblower claim. Roehlen again argues that the "acts of retaliation in their totality" show adverse employment action. (See Mem. in Opp'n at 20, 27.) Unlike his whistleblower claim, however, only one of the acts of retaliation he identifies—the department's refusal to reinstate him following his leave—can support his FMLA retaliation claim. All of the other supposedly retaliatory acts took place before Roehlen went on FMLA leave and thus cannot provide a basis for his claim that the County retaliated against him for taking that leave.

The County puts forth three arguments why Roehlen's FMLA claim fails as a matter of law: (1) he cannot show he was able to do his job; (2) he cannot establish a *prima facie* case; and (3) he is unable to show that their proffered explanations are pretext for retaliation. Again, because the County has proffered legitimate, non-retaliatory reasons for not reinstating Roehlen, the Court will not analyze whether he has made out a sufficient *prima facie* case but will skip to the question of pretext.

According to the County, Roehlen was not returned to his position as a deputy sheriff following his leave because they could not accommodate his new medical

restrictions, he was unable to perform duties of the job, and the department was concerned about potential liability. As set forth above, Roehlen may raise a genuine issue regarding pretext by showing that "the employer's explanation is 'unworthy of credence . . . because it has no basis in fact'" or by "'persuading the court that a [prohibited] reason more likely motivated the employer.'" Torgerson, 643 F.3d at 1047. In the Court's view, Roehlen has failed to show that the County's proffered reasons lack credence, and he has failed to present facts from which a jury could reasonably conclude that retaliation more likely motivated the refusal to return him as a deputy sheriff.

Roehlen claims the County's contention that he was unable to perform his job is unworthy of credence because he was able to perform all the job duties required of a deputy sheriff in the transport unit. The Court does not agree. Although Roehlen was unaware of anyone in the transport unit having actually made a forceful arrest, both Splittstoesser and Witzmann maintain that the ability to do so was required of any deputy sheriff. The general job description for a Ramsey County deputy sheriff supports this, providing that one must be able to "chase, apprehend, and detain suspects and prisoners" if necessary. (Ring Aff. Ex. 2, at 3.) Roehlen himself acknowledged that the ability to make a forceful arrest is a "threshold" requirement for a deputy sheriff. (Roehlen Dep. at 175.) Yet, tellingly, nowhere does he claim that he was able to do so. Witzmann and Splittstoesser each referenced this requirement when they were explaining to Roehlen why he could not return to his job, yet Roehlen never replied that he could make a forceful arrest. In the Court's view, the evidence supports the County's proffered reason that they refused to restore Roehlen to his job as a deputy sheriff following his FMLA

leave because he could not perform a requirement of that job. "[A]n employee is not entitled to restoration if, at the end of the FMLA leave period, the employee is still unable to perform an essential function of the job." Hatchett v. Philander Smith Coll., 251 F.3d 670, 677 (8th Cir. 2001) (citations omitted).

Roehlen argues that the department's proffered reasons are belied by the fact that the department never questioned his ability to do the job when he previously had "more severe" work restrictions following his surgery in 2007. (Mem. in Opp'n 24.) Yet the Court cannot agree that Roehlen was more severely restricted following his surgery. While both his post-surgery restrictions and his May 2010 restrictions provided that he should transport only restrained prisoners, the restrictions after his FMLA leave went further, broadly providing that Roehlen should be allowed to "exercise discretion" and to "decline any particular trip" if his back was bothering him. Witzmann expressed concern about the scheduling difficulties this would create in the unit. (See Splittstoesser Dep. Ex. 28.) This was also a legitimate concern supporting the department's proffered explanation that it was unable to accommodate Roehlen's restrictions, and there is no evidence it was pretextual. Hence, even if the department could have accommodated the restrained-prisoners-only restriction, and even if Roehlen could have made a forceful arrest, it may have been impossible for the County to accommodate a restriction giving him complete discretion to decline an assignment at any time.[5] Roehlen has not shown that this proffered reason was unworthy of credence or a pretext for retaliation.

---

[5] Notably, Roehlen has not brought any claim for violation of the Americans with Disabilities Act ("ADA"). The questions of whether the County undertook reasonable attempts to

Ultimately, Roehlen has presented absolutely no evidence suggesting that the County's decision not to reinstate him was retaliation for taking FMLA leave. Their proffered reasons have plausible bases in fact. The mere fact that the refusal to reinstate Roehlen immediately followed his FMLA leave is "insufficient to show a pretextual motive" rebutting a legitimate reason for an adverse employment action. Hervey, 527 F.3d at 723-24 (8th Cir. 2008) (quoting Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 916 (8th Cir. 2006)). In the absence of any material question of fact on the issue of pretext, Roehlen's FMLA claim fails as a matter of law.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 12) is **GRANTED**, and the Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 5, 2011

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

---

accommodate, or whether Roehlen could have performed the essential functions of his job with reasonable accommodations, are thus not before the Court.